**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**WINSTON HOLLOWAY**                                        **PLAINTIFFS**
**ADC # 67507**
**and**
**JOSEPH BREAULT**
**ADC # 79659**

**V.**                       **CASE NO. 5:07CV00088 JLH/BD**

**BENNY MAGNESS, et al.**                                   **DEFENDANTS**

## RECOMMENDED DISPOSITION

**I.      Procedure for Filing Objections:**

The following recommended disposition has been sent to Chief United States

District Court Judge J. Leon Holmes.  Any party may serve and file written objections to

this recommendation.  Objections should be specific and should include the factual or

legal basis for the objection.  If the objection is to a factual finding, specifically identify

that finding and the evidence that supports your objection.  An original and one copy of

your objections must be received in the office of the United States District Court Clerk no

later than fourteen (14) days from the date of this Recommendation.  A copy will be

furnished to the opposing party.  Failure to file timely objections may result in waiver of

the right to appeal questions of fact.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

II.     **Procedural Background:**

Plaintiffs are inmates in the Arkansas Department of Correction ("ADC").  In their Complaint, Amended Complaint, and Second Amended Complaint, Plaintiffs claim that telephone charges and medical co-pay requirements imposed on them by the ADC are unconstitutional.  (Docket Entries #1, #3, and #85)  With regard to the telephone charges, Plaintiffs allege that: (1) the ADC's contract for inmate telephone services includes excessive charges to inmates' families; (2) excessive telephone charge occasioned by the State's receipt of commissions on inmate telephone calls unconstitutionally "chills" their speech, in violation of their first amendment rights; (3) Defendant Tyler misled the public regarding prisoner telephone charges; (4) the ADC conspired with MCI to extort excessive telephone charges from prisoners; (5) the ADC contracted with Global Tel*Link ("GTL") without acknowledgment to the public; (6) the telephone charges have created an unlawful monopoly in violation of both the First and Fourteenth Amendments; (7) the ADC has a fiduciary duty not to benefit financially from the inmates; and (8) the telephone charges result in an unconstitutional taking without just compensation.

On May 14, 2010, Plaintiffs moved to dismiss all claims related to the medical co-pay.  (#193)  In addition, Plaintiffs moved to dismiss all claims regarding telephone charges except for their claim that the 45% "commission" the ADC receives for inmate telephone calls infringes upon their first amendment rights.  (#193)  The Court granted Plaintiffs' motion to dismiss.  (#202)

Also on May 14, 2010, Plaintiffs filed a motion for summary judgment on their first amendment claim.  (#195)  Separate Defendants Benny Magness, Larry Norris, Wendy Kelley, and Gaylon Lay (the "ADC Defendants") and Separate Defendant GTL responded by filing cross motions for summary judgment.  (#205 and #210)  On July 12, 2010, this Court heard oral arguments on the summary judgment motions.  (#224)

The Court recommends that Plaintiffs' motion for summary judgment (#195) be GRANTED, in part, and DENIED, in part; that the motion for summary judgment filed by the ADC Defendants (#205) be DENIED; and that Separate Defendant GTL's motion for summary judgment (#210) be GRANTED, in part, and DENIED, in part.

## III.    Factual Background:

On January 19, 2007, the State of Arkansas accepted a bid and entered into a contract (the "Contract") with GTL for telephone services for ADC inmates.  (#204-2 at p.1)  Under the terms of the Contract, GTL agreed to provide a collect-call telephone system for use by inmates housed in the ADC and Department of Community Correction ("DCC") from February 15, 2007, through February 14, 2012.  (#204-2 at p.1)  ADC and DCC inmates are not allowed to receive telephone calls from family members, friends, or others.  Nor are they allowed to use prepaid telephone cards or cellular telephones.  They are permitted, however, to make collect calls, *i.e.*, calls that the receiving party agrees to

pay for.  Virtually every ADC and DCC inmate-initiated call, whether long-distance or local, is subject to and handled under the Contract.[1]  (#204 at p.4)

During contract negotiations, the State received an offer from GTL to pay the ADC and DCC a so-called "commission"[2] of fifty-five percent (55%) of all gross revenues collected by it for calls under the proposed contract.[3]  (#204 at p.1)  GTL provided the Arkansas Board of Corrections (the "Board") with information that the 55% commission would result in an interstate call rate for inmates of $0.89 per minute and an IntraLATA, InterLATA, and a local rate of $0.24 per minute.  (#204-1 at p.1)  According to Defendant Magness, the Board  requested a contract with lower per-minute rates. (#204-1 at p.1)

In January, 2007, the ADC's Deputy Director of Residential Services sent a memorandum to the Board stating, "[b]oth the ADC and DCC recommend Option B

---

[1] While the parties did not raise the issue in their briefs or in oral argument, the Court assumes that inmate telephone calls made to attorneys also fall under the Contract and are subject to the Contract rates.

[2] The term "commission" is somewhat misleading.  The term "rebate" would be even more misleading, however, because the ADC pays no money at all to GTL; instead, the commission is paid entirely from money collected by GTL from those outside of the prison who accept collect calls from inmates.  The ADC performs no services and supplies no goods in return for the commission; rather, the commission is payment made by GTL to the ADC in return for receiving an exclusive contract to provide all telephone services for inmate telephone calls, both local and long-distance.

[3] The parties agreed to this definition of "commission" in their Statements of Undisputed Facts.  However, the contract actually provides that the ADC and DCC will receive a 55% commission on all "completed calls," so that the "commission revenue is not affected by uncollectable telephone bills."  (#222-2, at p. 15)

[providing for a 45% commission], which would provide a significant decrease in the costs for inmate families.  Under the current contract with MCI, we receive 51% commission on all calls, and while our annual revenues may decrease, we believe this would be a good faith effort to reduce the financial burden on inmate families."  (#222-1 at p.4)

In the final Contract, GTL agreed to pay a forty-five percent (45%) commission to the ADC and the DCC on all gross revenues collected for calls under the Contract.  The commission, as provided in the final Contract, results in an interstate call rate of $0.45 per minute and an IntraLATA, InterLATA, and local call rate of $0.12 per minute throughout the Contract term.  (#204 at pp.8-9, #204-1 at p.2).

Under a separate term in the Contract, GTL also charges the families and friends of inmates, and others who prepay into an account used to pay for calls from inmates, $9.50 for each $50.00 prepayment (19%) as an additional charge, separate from the charges for the telephone calls.  (#204 at pp.9-10)  So, for example, under the terms of the Contract, a ten-minute long distance telephone call would cost an inmate's parent or child $4.50.[4]  More than $2.00 of that $4.50 would then be sent to the ADC.  Reduced by 45%, that same ten-minute telephone call would cost only $2.48.  Counsel for GTL admitted

---

[4] With the 19% prepayment charge, that same call would cost an inmate's family approximately $5.35.

the obvious, *i.e.*, that GTL makes a profit from its contract with the Arkansas prison system, even after paying the 45% commission.  (#225, at p. 58)

The parties agree that the purpose of the commission paid under the Contract is not related in any way to ADC costs in providing telephone service to inmates.  (#204 at p. 5) Under the terms of the Contract, GTL covers all costs associated with the telephone system, including hardware and software, as well as billing and monitoring, at no cost to the Board, the ADC, or the DCC.  (#221-1 at pp. 43, 46, 54, 55)

The ADC's revenue from commissions paid thus far under the Contract with GTL is as follows:

> for the period May 2006 to May 2007 approximately $2,306,878.30;
> for the period June 2007 to May 2008 approximately $2,147,763.74;
> for the period June 2008 to May 2009 approximately $2,394,900.77; and
> for the period June 2009 to October 2009 approximately $975,913.86.

(#204-2 at p.1)[5]  The total amount of commissions paid to the ADC from GTL over approximately three-and-one-half years – from May of 2006 to October of 2009 – exceeds seven-and-one-half million dollars.  These payments to the ADC were derived entirely from inmates' friends, family, and others who spoke with ADC inmates by telephone during that period.

According to Sheila Sharp, Assistant Director for the ADC's Administrative Services Division, the ADC has used the revenue from telephone commissions it has

---

[5] The parties have not filed any evidence regarding the amount of GTL's commission payments to the DCC.  Neither of the Plaintiffs resides in a DCC facility.

received under the Contract to pay for "inmate benefits, operational needs, safety and security needs as well as quality of life projects that include such things as metal detectors, emergency and security equipment, computer equipment and maintenance, lock and door replacements, medical-services equipment, radio and communication maintenance, building construction and maintenance, weapons, and 'gate checks,' which are given to inmates as they are released from prison."  (#204-2 at pp.1-2)   But, as noted, none of the revenue derived from the telephone Contract is used for telephone-related expenditures.

## IV.   Discussion:

### A.     Summary Judgment Standard

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. FED.R.CIV.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 106 S.Ct. 2505 (1986).  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P . 56(e); *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (internal citation omitted) ("The nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a

genuine issue for trial.")  If the opposing party fails to carry that burden or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted.  *Celotex*, 477 U.S. at 322.

B.      Appropriate Arkansas Department of Correction Defendants

Plaintiffs originally named as Defendants Benny Magness, Chairman of the Board of Corrections for the ADC;[6] Larry Norris, former Director of the ADC; Dina Tyler, Spokesperson for the ADC; Rory Griffin, Infirmary Manager at the Cummins Unit of the ADC; Rex Gaylon Lay, Warden of the Cummins Unit of the ADC; and Wendy Kelley, Assistant Director of Treatment for the ADC.  Ms. Tyler and Mr. Griffin have been dismissed as party Defendants.  (#129 and #217)   Because Mr. Norris has retired as Director of the ADC, and Plaintiff named Mr. Norris in his official capacity only, Defendants have substituted Ray Hobbs, the new Director of the ADC, for Mr. Norris.  (#204 at p.2)  Accordingly, Mr. Norris is no longer a party.

In addition, all parties agree that Defendant Kelley's "responsibilities do not include oversight of the inmates' use of telephones."  (#196 at p.2, #204 at p.3, and #209 at p.1)  Because Defendant Kelley is not involved with the oversight of the telephone

---

[6]  The Board of Corrections for the ADC has "[g]eneral supervisory power and control over the Department of Correction and the Department of Community Correction and shall perform all functions with respect to the management and control of the adult correctional institutions and community correction options of this state."  ARK. CODE ANN. § 12-27-105(b)(1)(A).

services or the approval of the commission at issue in this lawsuit, Plaintiffs' claim

against Defendant Kelley should be dismissed.

Finally, in their Statement of Undisputed Facts, Plaintiffs state that Defendants

Magness and Lay "have authority and responsibility regarding the telephone services and

the 'commission' at issue in this case."[7] (#196 at p.1)  Defendant Magness, as Chairman

of the Board for the ADC, is involved in the oversight of the telephone service and the

approval of the Contract that provides for the 45% commission at issue in this case.

(#204-1, #225 at p.22-23)  In addition, Defendant Hobbs, as Director of the ADC, also is

involved in the oversight.

The ADC Defendants admit in their response to Plaintiffs' Statement of

Undisputed Facts that "Mr. Magness, Mr. Hobbs, and Mr. Lay have authority regarding

the telephone services at issue in this case and in plaintiffs' motion for summary

judgment."  (#204 at p.3)   Accordingly, Defendants Magness, Hobbs, and Lay are the

proper Defendants in this lawsuit.  Because Plaintiffs seek only injunctive relief, the

remaining Defendants are sued only in their official capacities.

C.     Standing

Although the ADC Defendants have not argued that Plaintiffs Holloway and

Breault lack standing to pursue their first amendment claim, the Court believes that this

---

[7] Although Plaintiffs also stated that Defendant Norris was involved in the oversight of telephone services at the ADC, as previously mentioned, Defendants have substituted Defendant Hobbs for Defendant Norris in this lawsuit.

issue deserves mention.[8]  To meet the standing requirement of Article III, "[a] plaintiff

must allege personal injury fairly traceable to the defendant's allegedly unlawful

conduct."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  Here, Plaintiffs Holloway and

Breault argue that the Policy adopted by the ADC Defendants unconstitutionally infringes

upon their first amendment rights.  Although the Policy affects both inmates and non-

inmates, Plaintiffs have presented evidence that *their* right to communicate with family

and friends outside of the prison walls has been chilled.  (#214-1 and #214-2)

Accordingly, Plaintiffs have standing to pursue this action in federal court.

      D.     Primary Jurisdiction and Filed-Rate Doctrine

      1.     Primary Jurisdiction Doctrine

      In their brief, the Defendants first argue that, because Plaintiffs are challenging

telephone rates charged by GTL, their claim is barred by the primary jurisdiction doctrine.

The primary jurisdiction doctrine applies "where a claim, though originally cognizable in

the courts, is of such a nature that the question involved initially should be determined by

an agency and [an agency determination] is usually required as necessary before a court

should proceed."  *U.S. v. Great Northern Ry. Co.*, 337 F.2d 243, 246 (8th Cir. 1964).  The

ADC Defendants argue that, because the telephone rates charged by GTL are regulated by

both the Federal Communications Commission ("FCC") and the Arkansas Public Service

---

     [8] ADC Defendants previously argued that Plaintiffs lacked standing to bring this claim on behalf of their families and friends.  The Court agreed and Plaintiffs' friends and family are not parties.  (#126 and #129)

Commission ("APSC"), if Plaintiffs seek a rate change, they must raise that issue with the appropriate regulatory agencies.

Plaintiffs dispute that the primary jurisdiction doctrine is applicable to this case because they are no longer seeking a rate change. (#225 at pp.7-8) The Plaintiffs, as masters of their lawsuit, have made it clear that their only remaining claim in the case is a first amendment claim. (#225 at pp.7-8) This Court cannot set telephone rates, but, contrary to Defendants' argument, federal courts do have jurisdiction over claims that State actors are acting in a way that improperly encroaches on the first amendment rights of others. Defendants are not entitled to summary judgment on the basis of the primary jurisdiction doctrine.

2.      Filed-Rate Doctrine

The Defendants also argue that the filed-rate doctrine prohibits Plaintiffs from bringing their claim in federal court. The filed-rate doctrine "forbids a *regulated entity* [from charging] rates for its services other than those properly filed with the appropriate federal regulatory authority" and concomitantly, "prohibits a party from *recovering damages* measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue." *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 679 (8th Cir. 2009) (emphasis added) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992) and *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925 (1981)). Both the ADC Defendants and GTL argue that, because the telephone rates

11

charged for inmate calls were filed with both the FCC and the APSC, the rates are not subject to attack in federal court.[9]

Plaintiffs' response to the Defendants' filed-rate doctrine argument is, again, that they are not seeking money damages, and they are not asking the Court to change rates, but rather seek a finding that State actors have negotiated a term to the Contract that results in an unlawful infringement on their right to communicate with persons outside the prison.

The filed-rate doctrine was judicially created in *Keogh v. Chicago and Nw. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47 (1922), when the Supreme Court barred plaintiffs in an anti-trust case from pursuing a price-fixing conspiracy claim. The doctrine prevents recovery of damages in cases where agencies (the Interstate Commerce Commission in the *Keogh* case) have approved defendants' rates. The reasons supporting the doctrine all pertain to money damages, which the Plaintiffs here do not seek.[10]

---

[9] It is unclear that the doctrine would directly benefit the ADC Defendants, in any event, since the ADC is not a "regulated entity" subject to a "federal regulatory agency." Of course, GTL is such an entity, and the doctrine prohibits it from collecting a rate other than its published rate.

[10] Justice Brandeis, writing for the Court, set out four reasons justifying the creation of the filed-rate exemption from Sherman Anti-Trust Act liability: (1) an anti-trust remedy was unnecessary because the Interstate Commerce Act provided actual damages and attorney's fees; (2) the filed rate prevented rate discrimination between shippers; (3) calculating damages might require the Court to determine the hypothetical rate that would have been approved by the regulatory body absent the anti-competitive conduct; and (4) plaintiffs' losses were too speculative to calculate. *Keogh*, 260 U.S. at 162-65, 43 S.Ct. 47.

The filed-rate doctrine is not a bar to this lawsuit because it does not prohibit Plaintiffs from bringing a first amendment claim for injunctive relief in federal court. (#225 at p.7)  Accordingly, Defendants are not entitled to summary judgment on the basis of the filed-rate doctrine.

E.      The First Amendment Claim

The ADC Defendants also argue that the Plaintiffs' claims do not implicate the First Amendment.  (#225 at p. 29)  The United States Supreme Court has squarely held that inmates have a constitutional right to communicate with people outside of prison. *Turner v. Safley* , 482 U.S. 78, 107 S.Ct. 2254 (1987).  Counsel for Defendants argue, however, that the First Amendment protects only the *content* of speech and not the method of transmittal.  (#225 at p.29)  Because the commission paid to the ADC and DCC under the Contract is not concerned with the content of inmates' telephone conversations, their argument goes, the First Amendment is not at issue.  In fact, the ADC Defendants argue that there is no first amendment right for prisoners to use telephones at all and that the ADC could remove all telephones from the prisons without violating the Constitution.  (#225 at pp. 29-30)

Plaintiffs argue not only that their claims implicate their first amendment right to communicate with those outside the prison, but also that the Court should apply strict scrutiny rather than the rational-basis test that is normally applied to determine the constitutionality of prison rules and policies.  See *Turner*, 482 U.S. at 81, 107 S.Ct. at

2257.  They also argue, however, that Plaintiffs should prevail regardless of whether the

Court applies strict-scrutiny or a rational-basis analysis.

    1.    Does the First Amendment Apply?

    It is settled law that those *not* incarcerated have first amendment rights in

connection with telephone usage.  See, *e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 526-27,

121 S.Ct. 1753, 1761 (2001)(holding that contents of telephone conversation are

protected by the First Amendment). It is also settled law that "the First Amendment right

of free speech applies within prison walls." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048

(9th Cir. 2002) (relying upon *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874

(1989)).  Among the first amendment rights prisoners retain is the right to communicate

with people on the outside, although this right is subject to restrictions inherent to prison

life.  At first glance, then, it appears axiomatic that a claim of a significant restriction on

inmates' access to telephones to contact people outside of the prison walls triggers a first

amendment analysis.  The ADC Defendants argue, however, that no first amendment

analysis is in order here because Plaintiffs have not raised a valid first amendment claim.

    It is one thing to argue that the Contract does not unlawfully *impinge* on prisoners'

first amendment rights.  It is quite another to argue that this case does not require a first

amendment analysis.[11]

_____

    [11] ADC Defendants argue that the telephone had not been invented at the time the
First Amendment was added to the United States Constitution, in support of their
argument that inmates' telephone use is not a first amendment issue. (#225 at p. 43-44)

Contrary to the ADC Defendants' argument, the First Amendment covers a wider purview than merely protecting the content of speech. Rather, it also encompasses the *opportunity* to speak, the *opportunity* to worship, the *opportunity* to assemble. Without the opportunity to speak, to assemble, to worship, the First Amendment is left in tatters.

For this reason, State actors cannot interfere impermissibly with those who wish to assemble, speak, or worship. For example, a city can require permits for demonstrations in public parks, but it cannot prohibit assembly in its public parks altogether. Likewise, a city cannot set permit fees at such an exorbitant level that assembly becomes impossible, as a practical matter. When an issue touches on State impediments to the opportunity to speak, worship or assemble, then the First Amendment is at issue.

In *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800 (1974), the Supreme Court considered a prison regulation prohibiting face-to-face interviews between inmates and news media. The Court analyzed the claim as a first amendment challenge but found that the ban was justified because of prison security concerns. 417 U.S. at 825, 94 S.Ct. at 2806.

---

The First Amendment was adopted, along with nine other amendments in the Bill of Rights, in 1791; Alexander Graham Bell patented the telephone almost one hundred years later, in 1876. These facts, however, do not advance Defendants' cause. For example, x-rays were not discovered until 1895, but few would argue that prisoners with broken legs are not to be afforded x-rays because that diagnostic tool was not available when the Eighth Amendment was adopted, barring cruel and unusual punishment.

15

*Block v. Rutherford* concerned a prison ban on "contact" visits.  Again, the

Supreme Court acknowledged that the ban implicated prisoners' first amendment rights,

but concluded that security concerns justified the restriction.  468 U.S. 576, 104 S.Ct.

3227 (1984).  See also, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1997) (analyzing

challenge to prison rule restricting inmates' receipt of hardback books as a first

amendment issue).

Most courts that have addressed the issue have held that prisoners have a limited

right to telephone access.  In *Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994), the Sixth

Circuit recognized prisoners' first amendment right to telephone access, but overruled the

district court's injunction of a Bureau of Prisons policy requiring that  prisoner calls be

paid for via inmate debit cards.  The *Washington* Court held that, "telephone access is

'subject to rational limitations in the face of legitimate security interests of the penal

institution,'" *Washington*, 35 F.3d at 1100 (quoting *Strandberg v. City of Helena*, 791

F.2d 744, 747 (9th Cir.1986)).  In a decision rendered a year later, the Sixth Circuit relied

on *Washington* in again holding that prisoners' right to use telephones to communicate

with friends and family was subject to "rational limitations in the face of legitimate

security interests of the penal institution."  *Smith v. Bradley*, 53 F.3d 332 (6th Cir. 1995)

(unpublished opinion) (quoting *Strandberg*, 791 F.2d at 747).  The *Smith* court further

held that the, "exact nature of telephone service to be provided to inmates is generally to

be determined by prison administrators, subject to court scrutiny for unreasonable

restriction." *Id.* (quoting *Fillmore v. Ordonez*, 829 F. Supp. 1544, 1563-64 (D. Kan. 1993), aff'd, 17 F.3d 1436 (10th Cir. 1994)).

A federal district court in Maryland relied on *Washington* in acknowledging inmates' first amendment rights to communicate with family and friends, subject to "rational limitations in the face of legitimate security interests." *Graham v. State of Md.,* 2004 WL 3704202, *1 (D. Md. 2004).  In *Graham*, the Court held that the prison's policy of limiting prisoners' calls to five minutes and monitoring calls in an institution housing hundreds of detainees and prisoners was not unreasonable.

In *Johnson v. California*, 207 F.3d 650 (9th Cir. 2000) (per curiam), inmates in the California prison system claimed that rates charged for inmate telephones calls were so excessive that they infringed on their right to communicate with family and friends.  The Ninth Circuit acknowledged that "prisoners have a First Amendment right to telephone access," but ultimately concluded that the rates there were not so high as to interfere with the inmates' first amendment rights.  *Johnson*, 207 F. 3d at 656.

The Eighth Circuit Court of Appeals has noted that the First Amendment may include "a right to use the telephone for communication with relatives and friends." *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989).  In a second decision, the Eighth Circuit held that the First Amendment did not require that death-row inmates "be afforded more than one hour per week of telephone access for personal phone calls," when the limit did not include telephone calls to their attorneys.  *McDonald v.*

17

*Armontrout*, 908 F.2d 388, 392 (8th Cir. 1990).  See also, *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996) (upholding prison's regulation limiting inmates to a ten-person calling list after applying *Turner* factors and finding "a valid, rational connection exists between the telephone restriction and the legitimate governmental interest put forward to justify it"); *Hutchings v. Corum*, 501 F. Supp. 1276, 1296 (W.D.Mo. 1980) (holding that prison inmates may have a right to use the telephone for communication with relatives and friends, "subject to rational limitations in the face of legitimate security interests of the penal institution"); *Lopez v. Reyes*, 692 F.2d 15, 17 (5th Cir. 1982) (holding prisoners have no right to *unlimited* telephone use); *Valdez*, 302 F.3d at 1045-46 (no constitutional violation in restricting pretrial detainee's use of telephone to prevent him from tipping off co-conspirators about indictments since restrictions were reasonably related to government's legitimate interest in ensuring officer safety when executing arrests and preventing detainee from helping others elude arrest); *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir. 1988)(holding that telephone access may be restricted so long as the restrictions are reasonable and are rationally related to legitimate security interests and upholding policy limiting pre-trial detainee's telephone access to every other day); *Douglas v. Gusman*, 567 F. Supp. 2d 877, 886 (E.D.La. 2008)(holding that prisoner's right to telephone access subject to rational limitations in the face of legitimate security interests of the penal institution)(citing *Washington*, *Benzel*, and *Strandberg*, *supra*).

18

By contrast, the Seventh Circuit, in a case factually similar to the present case, held that Illinois prisoners did not have a constitutionally protected right to telephone use. *Arsberry v. Illinois,* 244 F.3d 558 (7th Cir. 2001).  As in the present case, the plaintiffs in *Arsberry* complained that they were forced to use one prison-selected telephone provider, and that the prison's 50% kickback from the revenues collected from inmate telephone calls violated their first amendment rights.  The *Arsberry* Court concluded, without an in-depth analysis, that the First Amendment did not apply:

> Although the telephone *can* be used to convey communications that are protected by the First Amendment, that is not its primary use and it is extremely rare for inmates and their callers to use the telephone for this purpose.  Not to allow them access to a telephone might be questionable on other grounds, but to suppose that it would infringe the First Amendment would be doctrinaire in the extreme.

*Asberry*, 244 F.3d at p.565-66 (emphasis in original).

The First Circuit also found that inmate plaintiffs have "no per se constitutional right to use a telephone."  *United States v. Footman*, 215 F.3d 145, 155 (1st Cir. 2000). As with *Arsberry*, the *Footman* decision does not include a significant discussion as to why the First Amendment would not apply, but rather offers a bare holding.[12]

Undeniably, prisoners have a first amendment right to communicate with people on the outside, as announced in *Turner*, *supra*.  The ADC Defendants argue that other

---

[12] The holding in *Footman* arguably does not go so far as the *Arsberry* decision, in the sense that telephone access obviously is quite different from other rights, such as prisoners' per se right to adequate medical care.

means of communicating render prisoners' telephone access an "extra," rather than a

basic means of communication.[13]  They argue that inmates can communicate with family,

friends, and others through letters and personal visits and, therefore, there is no call for a

first amendment examination.

There is a conundrum in Defendants' argument that other means of communication

obviate inmates' access to telephones.  The second prong of the *Turner* rational basis test

(generally applied to first amendment claims in the prison setting) is "whether there are

alternative means of exercising the asserted constitutional right that remain open to

inmates." *Turner*, 482 U.S. at 90.  It begs the question to apply one leg of a first

amendment analysis to conclude that there is no first amendment issue to be analyzed.

Given that prison inmates have a constitutional right to communicate with those on the

outside, how can a court logically jump to the second prong of the *Turner* test without

acknowledging that its analysis necessarily involves the First Amendment?  A court may

find that alternative means of communication adequately substitute for telephone calls –

*after* a *Turner* analysis –  but it is incongruous to apply a portion of the *Turner* test to

conclude that no first amendment analysis was called for in the first place.

The better view is to acknowledge that regulations and policies that limit or

impede prisoner communication with family, friends, attorneys, and others implicate first

---

[13] Counsel for Defendants argue that inmate complaints regarding telephone use
were analogous to their objections to the color of prison walls.  (#225, at p. 33)
Comparing complaints of decor with fundamental rights is misguided.

amendment rights.  That does not end the inquiry, but it does allow for a logical, reasoned

approach to the issue of whether a given regulation or imposition is a permissible

incursion or an untenable infringement on a constitutional right.  The issue in this case,

then, is properly addressed as a first amendment claim.

2.      Appropriate Legal Standard

Having determined that there is indeed a first amendment issue here, the next task

is to decide whether to apply strict scrutiny or the looser rational basis test.  Plaintiffs

make a compelling argument for strict scrutiny.  They argue that, because the ADC

Defendants concede that the only justification for collecting a commission is to provide

funds for general prison operations, a heightened standard should apply.  Plaintiffs argue

that, because the commission is used solely to augment the ADC's general budget, the

policy of contracting for a commission substantially affecting the rate charged to inmates'

families (the "Policy") should have to hold up under strict scrutiny.  To their credit, the

ADC Defendants do not attempt to conjure make-weight arguments that the Policy at

issue here involves security or keeping order at the prison, except to the extent that

Arkansas prisons need the money generated from inmate telephone calls.[14]

Plaintiffs rely upon *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989), and

*Pargo v. Elliott*, 49 F.3d 1355 (8th Cir. 1995), to support their argument that this case

---

[14] Defendants do argue that the commission helps defray general prison costs that include, of course, security costs.

requires heightened scrutiny.  In *Pitts*, female inmates challenged the District of

Columbia's policy of housing long-term female inmates in the Federal Correctional

Institution located in Alderson, West Virginia, "a remote, mountain-based hamlet situated

far from Washington, D.C." *Pitts*, 49 F.3d at 1451.  The female inmates argued that the

City's policy of housing similarly situated male inmates nearer the City unconstitutionally

discriminated against them based on their gender.  The District of Columbia argued that,

because the challenged classification operated in a prison context, the Court should

determine only whether their policy was reasonably related to legitimate state interests by

using the factors articulated by the Supreme Court in *Turner*.

Although the Court ultimately ruled in the District of Columbia's favor, the Court

concluded that the "heightened scrutiny traditionally applied in cases alleging gender

discrimination [was] appropriate." *Pitts*, 866 F.2d at 1453.  The Court held that "the

basic policy decision whether to provide a local women's prison facility [did] not directly

implicate either prison security or control of inmate behavior, nor [did] it go to the prison

environment and regime." *Id*. at 1454.  Rather, the decision involved "general budgetary

and policy choices made over decades in the give and take of city politics." *Id*. at 1453-

54.  Accordingly, the government had to present evidence that the manner in which

female and male inmates were housed was substantially related to an important

government interest.  The *Pitts* Court reasoned that the equal protection claim at issue

was "a demand that governmental action that affects an individual not be predicated upon

constitutionally defective reasoning" and that "the claim charge[d] invidiousness, rather than an unwarranted interference with constitutionally secured liberties." *Id*. at 1455.

Similarly, in *Pargo*, female inmates brought a class action against prison officials alleging that differences between programs in men's and women's units deprived women of equal protection.  In *Pargo*, the trial court used the *Turner* factors to analyze the policy at issue.  On appeal, the female prisoners argued that the government should have been required to demonstrate that the difference in prison programs and services was "substantially related to an important governmental interest," and that the trial court had erred in applying the lower level of judicial scrutiny.  *Pargo*, 49 F.3d at 1356.

The Eighth Circuit, acknowledging the District of Columbia Circuit's decision in *Pitts*, held that, "*Turner* does not foreclose all heightened judicial review" and that *Turner* "does not render prison regulations immune from judicial review."  *Id*. at 1357.  The Court, however, remanded the case to the trial court to determine the proper standard to apply.  The trial court ultimately determined that the difference in treatment, programs and services afforded female inmates as compared to similarly situated male inmates were rationally related to legitimate government interests, and the Eighth Circuit affirmed (applying the lower level of scrutiny rather than the heightened scrutiny urged by the female inmates).  *Pargo v. Elliott*, 69 F.3d 280, 281 (8th Cir. 1995) (per curiam).

Here, Plaintiffs contend that because the challenged Policy involves only general budgetary concerns, it also should be analyzed under a heightened standard.  While the

Policy here involves the ADC Defendants' general budgetary concerns, the *Pitts* rationale is not dispositive.  Notably, *Pitts* involved an equal protection claim based on gender.  These cases historically have been analyzed under a heightened standard.  See *Roubideax v. North Dakota Dept. of Corr. & Rehab.*, 570 F.3d 966 (8th Cir. 2009); and *Duckworth v. St. Louis Metro. Police Dept.*, 491 F.3d 401 (8th Cir. 2007) (citing *Nguyen v. INS*, 533 U.S. 53, 60, 121 S.Ct. 2053 (2001)(internal citation omitted)("[f]or a gender-based classification to withstand equal protection scrutiny, it must be established at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives").

Further, while budgetary concerns were underlying the challenge raised in *Pitts*, the constitutional concern was invidious discrimination.  That is not the case here.  Instead, the present case involves a first amendment claim, and those claims historically have been analyzed using the factors articulated in *Turner*.  See *Roe v. Crawford*, 514 F.3d 789, 794 (8th Cir. 2008) and *Benzel*, 869 F.2d at 1108.

Moreover, although this case does not involve a "day-to-day prison regulation," it does involve a Board policy that affects inmates' daily lives.  It is, therefore, an integral part of the "prison environmental regime."  The Board approved the Contract with GTL that entitles the ADC to receive the 45% commission.  Although the decision is not immune from judicial scrutiny, the Board's decision should be given some deference.  If

24

this were not the case, every contractual agreement made by the Board would be susceptible to judicial challenge, and the Board would have to be prepared to articulate whether each contract it entered into was substantially related to important government interests. This level of scrutiny would place an undue burden on the Board and would leave courts in the undesirable position of playing an unacceptable role in the operation of prisons – a position that the courts historically have resisted due to the unique and complex issues involved in prison organization and maintenance. See *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125, 128, 97 S.Ct 532 (1977) (noting that a lower court had "got[ten] off on the wrong foot . . . by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement . . . . [P]rison administrators and not the courts[] [are] to make the difficult judgment concerning institutional operations").

Accordingly, in this case, the Policy of receiving a commission should be analyzed under *Turner* to determine whether it is "reasonably related to a legitimate governmental interest." *Turner*, 482 U.S. at 87, 107 S.Ct. 2260-61.

In *Turner*, prisoners challenged two regulations, including a prohibition of inmates' marriages unless approved by a prison superintendent. The Court acknowledged that the regulation affected both prisoners and non-prisoners and that the implication of the non-prisoners' rights could support the application of higher scrutiny. The Court determined that, although the restriction could "entail a consequential restriction on the

[constitutional] rights of those who are not prisoners," it did not have to address that question because "under the reasonable relationship test, the marriage regulation does not withstand scrutiny." *Turner*, 482 U.S. at 97.

As in *Turner*, the Board's Policy of collecting a substantial commission on all inmate calls affects non-prisoners. Accordingly, a heightened standard – often referred to as the *Martinez* standard – might apply to the constitutional interests of the non-prisoners. *Procunier v. Martinez*, 416 U.S. 396 (1974). The Court will not address that question because it is not necessary to the disposition of the case.[15]

F.      *Turner* Analysis

In *Turner*, the Supreme Court set out four factors to consider in determining whether a prison policy or regulation that infringes on a first amendment right is permissible: (1) whether a valid, rational connection exists between the regulation and the legitimate government interest; (2) alternative avenues available for the exercise of the right infringed upon; (3) the impact of an accommodation on others; and (4) the absence of ready alternatives. *Turner,* 482 U.S. at 89-91 107 S.Ct. at 2261-2262.

1.      Valid Rational Connection between the Policy and a Legitimate
        Penological  Interest

The first factor under *Turner* is whether there is a valid, rational connection between the Policy and a legitimate penological interest. Here, the ADC Defendants

---

[15] As noted *supra*, Plaintiffs' families and friends are not parties to this case. (#126 and #129)

argue that their legitimate penological interest is raising revenue for the ADC.  (#207 at p. 18)  They contend that, on that basis alone, there is a rational connection between the Policy of collecting a 45% commission and their legitimate penological interest.  They concede the revenue they receive from the commission is used for general prison purposes, but argue that this includes various security measures at the ADC.[16]  (#207 at p. 19)

Plaintiffs assert that there is no "valid rational connection" between the Policy of collecting the commission and "a legitimate and neutral governmental interest put forward to justify it."  See *Turner*, 482 U.S. at 89, 107 S.Ct. 2262.  Plaintiffs argue that, under *Turner*, the Policy in this case is "so remote" from the "asserted goal," *i.e.*, general prison operations, that it is rendered "arbitrary or irrational."  *Id.* 482 U.S. at 89-90, 107 S.Ct. 2262.

Defendants concede that the ADC does not spend any of the revenue collected from commissions on anything connected with the inmate telephone system.  (#204 at p.7)  The commission here is simply a percentage agreed to by the Board and GTL in negotiating the Contract.  (#204 at p.5, 8, and 9)  Plaintiffs claim, therefore, that the Policy is arbitrary.

---

[16]  Not all of the revenue generated by the commission goes towards security at the ADC – unless building maintenance (including new roofs, ceilings, and employee residences) is considered a security expenditure.  (#214-6 at pp.1-3)  While such costs are, no doubt, necessary in operating a prison, the Court is not willing to interpret the phrase "prison security" in such an expansive manner.

In *Turner*, the Supreme Court emphasized the importance of a connection between a challenged regulation or policy and the legitimate government interest it *seeks to advance.* The Court stressed that the relationship must not be so tenuous as to "render the policy arbitrary or irrational" and, even if related, the regulation or policy cannot stand if it is an "exaggerated response" to the goal it is designed to advance. *Turner*, 482 U.S. at 87, 89-90.

Following the *Turner* decision, courts have struck down prison regulations where there is no rational connection between the policy or regulation at issue and the specific penological interest advanced. For example, in *Love v. Reed*, 216 F.3d 682 (8th Cir. 2000), an inmate prisoner challenged the ADC's refusal to provide him food from the prison kitchen to prepare Sabbath meals in his cell. In that case, the ADC advanced two penological interests to support its policy decision. First, the ADC argued that the "hoarding of food from the kitchen would increase the probability of spoilage, thereby compromising the penological interest in maintaining a sanitary facility." *Id*. at 690. In addition, the ADC argued, if they allowed the plaintiff in that case such a "privilege," "other inmates [would] demand the same privilege, and the resulting discontent [would] compromise the penlogical interests of security and order." *Id.* The Eighth Circuit, upholding the district court's decision, found neither of these interests adequate.

The Court noted that the ADC's "interest in health and sanitation" was "legitimate," but held that "a blanket prohibition of food from the facility kitchen is not

28

reasonably related to that interest." *Id*. Because the items the plaintiff had requested –
peanut butter and bread – were available for other prisoners to purchase in the
commissary to keep in their cells, the accommodation which the plaintiff sought posed no
more of a threat than the common practices already in place at the prison.

Moreover, the Eighth Circuit held that the ADC's fear that other prisoners would
request dietary preferences if they accommodated the plaintiff was not a legitimate reason
to deny the accommodation. The ADC had an obligation to consider other inmates'
requests, if those requests were made upon "sincerely held religious beliefs." *Id*. at 691.
The Court concluded that the ADC's blanket refusal to accommodate the plaintiff's
dietary needs was not "reasonably related to a legitimate penological interest." *Id*.

Similarly, in *Clement v. California Dept. of Corr.*, 364 F.3d 1148 (9th Cir. 2004),
the Ninth Circuit Court of Appeals held that a prison regulation prohibiting inmates from
receiving mail that included material downloaded from the internet violated the inmate
prisoner's first amendment rights. Although the California Department of Corrections
("CDC") argued that allowing inmates to receive such mail would "drastically increase
the volume of mail that the prison had to process" and create a security concern because
inmates could insert coded materials into internet-generated mail more easily than into
photocopied or handwritten material, the Court determined that the CDC had failed to
"articulate a rational or logical connection between its policy and these interests."
*Clement*, 354 F.3d at 1152. See also *Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001)

(holding that a policy prohibiting inmates from receiving any bulk-rate third or fourth class mail was "an arbitrary means of achieving the goal of volume control").[17]

The facts in this case are more compelling.  Here, the ADC Defendants argue that their Policy of collecting a commission on inmate telephone calls is reasonably related to their interest in raising general prison revenue, part of which is used to support security features at the ADC.  Certainly, security is not only a legitimate penological interest, but also a vital concern.

In this case, however, there is no connection between maintaining security at the ADC and collecting a commission from inmates' calls – except, of course, the attenuated link between additional money, a bigger budget, hence more money to spend at the prison – including on security features.[18]  None of the funds collected from the commission are used to support the inmate telephone system or to resolve security problems resulting from telephone use.  There is, in fact, a complete disconnect between the penological

---

[17] After concluding that the prison regulation was not reasonably related to the government interests advanced, the court in *Clement* declined to analyze the remaining *Turner* factors.  See also *Eckford-El v. Toombs*, 760 F.Supp 1267, 1272 (W.D. Mich. 1991) (stating that because state defendants had "failed to articulate any legitimate, content-neutral interest rationally furthered by their action . . . further analysis of the *Turner* standards is unnecessary").  Although this Court also finds that the ADC Defendants have failed to articulate a government interest rationally connected to the collection of the commission, in an effort to provide a complete analysis, the Court will evaluate each of the *Turner* factors.

[18] The undisputed evidence in this case is that the commission collected by the ADC also is used to fund various other administration fees, personal computers, printers, heartbeat monitors, and infirmary renovations.  (#225 at p.65 and #214-6)

interest advanced by the Defendants – augmenting prison revenue for general operating expenses – and the Policy of artificially inflating the cost of inmates' telephone calls and thereby imposing a substantial burden on a constitutionally protected right.

There is no suggestion that the commission is being spent on non-prison-related goods or services.  Presumably the commission is being used to pay for legitimate general expenditures related to running the prisons.  And, there is no suggestion that the Policy was included in the Contract for the purpose of discouraging inmates' telephone usage.  In fact, under the Policy, the more inmates talk, the more money the ADC receives.  A lack of bad intentions, however, cannot save the Policy.

Here, the Board negotiated the commission with GTL.  Although they could have negotiated a 5% or a 95% commission, the parties agreed to a 45% commission.  The ADC Defendants have failed to provide any justification for the 45% commission as it relates to the provision of inmate telephone services.[19]  According to the evidence in this case, the commission is an arbitrary percentage negotiated between the telephone service provider and prison authorities.  It bears no rational relationship to the goal of funding prisons.

2.     Alternatives Available for Plaintiffs to Exercise their Rights

---

[19]  At oral argument, counsel for the ADC Defendants stated that although GTL originally proposed a 55% commission, the ADC agreed to the lower commission of 45%.  (#225 at p.44-45)

The second factor in the *Turner* analysis is whether there are alternative means of exercising Plaintiffs' first amendment rights.  Plaintiffs have no means of talking by telephone except by using the system operated by GTL, under the Contract at issue here. Inmates are not allowed to use prepaid telephone cards; they do not have the option to switch to a different carrier; they are not allowed to have cellular telephones.

Defendants argue, however, that Plaintiffs are allowed to communicate through personal visits and through written correspondence.  While those avenues of communication are available, for these Plaintiffs, those alternative means of communication are an unsatisfactory substitute for real-time conversations with loved ones, attorneys, and others.

It is undisputed that Plaintiff Holloway's family lives outside of Arkansas.  His sisters live in Lufkin, Texas.  One of his sons lives in Arizona; the other son lives in Florida.  (#214-2 at p.1-2)  In addition, Plaintiff Holloway's son, Jason, serves in the United States Army and is often deployed overseas.  (#214-2 at p.1)

Plaintiff Holloway also has three grandchildren – ages eight, seven, and five. (#214-2 at p.1-2)   Plaintiff Holloway states that his "grandchildren do not write letters" to him.  (#214-2 at p.2)  Even the most exceptional five-year-old would be hard-pressed to communicate with a grandparent exclusively through the written word.  Plaintiff Holloway also explains that "letters are no substitute for telephone calls with [his] family because they are so infrequent, they do not keep [him] in touch with [his] grandchildren,

voices and emotions cannot be heard in letters, there is no back and forth or spontaneity, and the delay in exchanges is too great."  (#214-2 at p.2)

Plaintiff Breault states that his closest friend outside of the prison resides in Harrison, Arkansas.  Because of her medical condition, she cannot drive to visit Plaintiff Breault in prison.  As a result, she visits "no more than twice a month and sometimes only once every six weeks."  (#214-3 at p.1)  Plaintiff Breault also reemphasizes that "[l]etters are no substitute for telephone calls."  (#214-3 at p.1)  To their credit, the ADC Defendants recognize that the commission creates a financial burden on inmates and their families, as evidenced by the decision to reduce their take from 55% commission first proposed by GTL to the current 45% (#222-1 at pp. 3-4, #204-1 at pp. 1-2).

In some circumstances, some inmates may be limited to letters and visits, and certainly prison officials can place restrictions on telephone use by inmates.  For example, prison officials may properly require inmates to place telephone calls only to telephone numbers on a pre-approved list. See, *e.g.*, *Benzel*, 869 F.2d 1105 (upholding policy of limiting use by inmates in disciplinary segregation to pre-approved list of at most three people); *Pope*, 101 F.3d at 1385 (upholding policy limiting use to pre-approved calling list of at most ten people); *Washington*, 35 F.3d at 1100 (upholding policy limiting use to pre-approved list of thirty people).  Likewise, prison officials may, for a rational reason, block particular numbers, thereby preventing inmates from calling certain numbers.  But,

in 2010, it is not reasonable to contend that letters are a blanket substitute for real-time verbal conversations with loved ones in distant places.

Because of these Plaintiffs' circumstances, written correspondence and personal visits are not adequate alternatives for exercising their first amendment right to communicate with friends and family.  Plaintiffs are not permitted to correspond via email or the internet.  The only consistent, practical, real-time communication available to these Plaintiffs with distant friends and relatives, including those too young to competently read and write, is by telephone.

The ADC Defendants also argue that the First Amendment is not offended because the Policy of collecting a commission does not completely deprive Plaintiffs of their right to communicate by telephone.  It is not necessary that Plaintiffs experience a complete deprivation of telephone services, however, to state a constitutional claim.  If there is a right to some telephone access, it follows that, at some point, artificially inflating the cost of exercising that right can amount to a deprivation.

In *Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943), the United States Supreme Court rejected a similar argument regarding the imposition on a license tax.  The *Murdock* Court held that the constitutionally guaranteed right need not be completely suppressed for a constitutional violation to occur.  *Id*. at 112-14.  Simply stated, "[a] State may not impose a charge for the enjoyment of a right granted by the federal constitution." *Id* at 113.  The same rationale applies to the facts at issue here.

Although Plaintiffs may continue to enjoy the right to communicate with their family and friends by using the inmate telephone system, this communication has been curtailed based upon the artificially inflated cost of using the telephone. Defendants were aware when they agreed to the Contract that the commission had a direct effect on the per- minute rate charged for inmate telephone calls. (#222-1 at p.4, #204 at pp. 8-9, #204-1 at p.2) In fact, they acknowledged the burden the commission places on inmates' families when they selected a plan that rendered a 45% commission in place of a 55% commission. (#206-1)

Plaintiffs have presented evidence that the commission provided under the Contract has had a chilling effect on their ability to exercise their first amendment right to communicate with family and friends by telephone. (#214-2, #214-3) Specifically, Plaintiff Holloway states that he makes only about two calls each month, and Plaintiff Breault makes only two calls each week. (#204 at p.10-11) Further, Plaintiffs have testified that telephone communications are extremely important to them. (#214-2 at p.3, #214-3 at p.2) Accordingly, this *Turner* factor weighs in the Plaintiffs' favor.

The Court finds that telephone usage in the year 2010, though not an unfettered right, is an integral part of an inmate's first amendment right to communicate with family, friends, attorneys and others. See, *e.g.*, *Johnson v. Galli*, 596 F.Supp. 135, 138 (D.Nev. 1984) (stating that "there is no legitimate governmental purpose to be attained by not

allowing reasonable access to the telephone, and . . . such use is protected by the First Amendment").

3.    Impact of the Accommodation for Other Inmates and Prison Guards

Under *Turner*, the third factor that must be evaluated is the "impact [that the] accommodation of the asserted constitutional right will have on guards and other inmates." *Turner*, 482 U.S. at 90.

It is undisputed that inmate communication with family and friends outside of the prison walls improves inmate behavior and, therefore, improves security at the ADC. (#225 at pp.17 and 46-47)  Currently, the cost of the inmate phone calls is increased by nearly 82% because of the commission.[20]  Accordingly, the elimination of the commission has the potential to reduce the cost of an inmate telephone call by nearly half.

The Court is aware that, for the reasons discussed above, it does not have the authority to alter the per-minute rate currently charged under the Contract, which has been approved by both the FCC and APSC[21] and that, if the commission is eliminated, the cost

---

[20] Under the Contract, a Plaintiff's $10.00 collect call necessarily includes $4.50 that must be sent to the ADC.  What would be a $5.50 telephone call without inclusion of the commission amount becomes a $10.00 telephone call.  The additional $4.50, when compared to what would otherwise be a $5.50 call, results in an almost 82% increase cost to the telephone customer ($4.50 is 81.8% of $5.50).

[21] To say that the FCC and APSC have "approved" the rate is true, but it may be somewhat misleading.  After the Federal Telecommunications Act of 1996 was passed, the FCC no longer has to regulate domestic telephone service provided by non-dominant (non-monopoly) carriers if the agency finds it unnecessary to do so.  See 47 U.S.C. § 160(a).  Carriers no longer have to file their tariffs with the FCC in order to have them approved.  Instead, the are required to publicly disclose their tariffs, so that consumers,

36

of inmate telephone calls, at least for the time being, may remain the same.[22]

Consequently, at this time, this factor, as a practical matter, does not immediately weigh

in the Plaintiffs' favor.  Without a commission, however, the Board should be able to

negotiate a much lower per-minute rate for inmate calls in future contracts.[23]

The ADC Defendants argued at oral argument that if the commission is eliminated

it would have a negative effect on both prison guards and inmates because over two

million dollars would be "taken away from [the ADC's] budget."  (#225 at p.37)  The

Court acknowledges that the elimination of the commission may well affect the ADC's

budget and, consequently, affect prison guards and inmates.  This general but-for impact

is not the kind envisioned by the *Turner* Court.  Just as the Court is without power to

adjust the per-minute rate, it also is unable to solve the problem of funding prisons that

are enormously expensive to run.  But, the ADC must somehow manage its budget in a

manner that does not unduly infringe upon the first amendment rights of inmates.

---

presumably, can choose from among carriers.  47 C.F.R. §§42.10-11.  Of course,
Plaintiffs here have no such choice of carriers.

[22] If the ADC and DCC are no longer entitled to receive the commission and if
GTL continues to charge the existing rate, the result may well result in a windfall for
GTL.

[23] The Contract provides that the parties may, with mutual agreement, modify the
per minute rates charged at any time during the contract terms.  (#222-2 at p.17)

4.      Absence of Ready Alternatives

The last factor that must be evaluated under *Turner* is whether there are ready alternatives to the Policy of contracting for a 45% commission.  The only problem raised by the elimination of  the commission is that the general revenue of the prisons will be affected.  Plaintiffs argue that the revenue should come from the General Assembly of Arkansas.  While Plaintiffs acknowledge such revenue could be difficult to secure, they contend it is the appropriate and legitimate source of funding the ADC's general operating expenses.

It is beyond the authority of this Court to determine – or even recommend – how the State should specifically make up any shortfall occasioned by the elimination of the commission.[24]  While there may not be an easy solution for the ADC Defendants, their current policy of placing the burden of funding the general operating expenses of the ADC on the backs of inmates and their families is constitutionally infirm.  There is a legitimate, alternative funding source available to the ADC Defendants, and this factor weighs in Plaintiffs' favor.

---

[24] That said, the General Assembly, as the body responsible for the budget for the State of Arkansas, has the duty and authority to appropriate funds for the operation of the prisons in Arkansas.  See ARK. CODE ANN. § 12-27-103(b)(9)("The Department of Correction may establish and operate regional adult detention facilities, provided funds therefor have been authorized and appropriated by the General Assembly").

38

G.     Remedy

Having evaluated each of the *Turner* factors, the Court concludes that the State's

Policy to require a 45% commission for all calls made under its Contract with GTL is not

reasonably related to a legitimate penological interest.  The burden on inmates is not *de*

*minimis*, but rather results in an 81.8% increase – at least – in long-distance telephone

calls made by inmates in the ADC.  Accordingly, the Policy unreasonably infringes on

Plaintiffs' first amendment right to communicate with their attorneys, friends, and family

outside the prison walls.

Plaintiffs seek a "permanent injunction, immediately enjoining the ADC

Defendants from receiving any more 'commission' funds.'"  (#197 at p. 14)  Plaintiffs

also seek a permanent injunction to "immediately enjoin GTL from collecting the

'commission' and from paying any more 'commission' funds to the ADC."  (#197 at p.

14)

The District Court has authority to grant injunctive relief in a case brought under

42 U.S.C. § 1983, where the plaintiff has established the deprivation of a constitutional

right.  See *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004).  For the reasons set forth

above, however, the Court lacks the authority to order GTL to change the rate it charges

and collects for inmate calls under the Contract.  Furthermore, it is important to note that

this is not a class action.  Both named Plaintiffs are incarcerated in the ADC, so

commissions paid to the DCC are beyond the scope of this lawsuit.

The Court, therefore, recommends that the District Court enjoin separate

Defendant GTL from paying any commission to the Arkansas Department of Correction

during the remaining term of the Contract and recommends that it enjoin the Arkansas

Department of Correction from accepting any commission payments from GTL during the

remaining term of the Contract.[25]

## V.    Conclusion:

The Court recommends that Defendant Kelley be dismissed; that Plaintiffs' motion

for summary judgment (#195) be GRANTED, in part, and DENIED, in part; that the

motion for summary judgment filed by the ADC Defendants (#205) be DENIED; that

Separate Defendant GTL's motion for summary judgment (#210) be GRANTED, in part,

and DENIED, in part; that Plaintiffs' claims, other than their first amendment claims

addressed here, be dismissed without prejudice; and that this case be dismissed.

DATED this 13th day of September, 2010.


_____
UNITED STATES MAGISTRATE JUDGE

---

[25] The Contract is set to expire on February 15, 2012,  five years from the date of award in 2007, unless the term is renewed by mutual agreement of the parties for two additional one-year terms.  (#222-1 at p. 38) As noted, the ADC and GTL are free to modify their Contract so as to prevent a windfall to GTL until this Contract expires (#222-2 at p. 17)