**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

WINSTON HOLLOWAY, ADC # 67507;                                    PLAINTIFFS
and JOSEPH BREAULT, ADC # 79659

v.                              NO. 5:07CV00088 JLH-BD

BENNY MAGNESS, *et al.*                                    DEFENDANTS

## OPINION AND ORDER

This is another in a long line of cases brought by inmates challenging the economic

arrangements pursuant to which telephone services are made available to them.  In Arkansas, as in

many states, the prison system contracted with a telephone company for telephone services to

inmates and, in return, the telephone company pays the prison system a percentage of the revenue

that is received on inmate telephone calls.  The issue before the Court is whether such a contract

violates the First Amendment rights of inmates.  The parties filed cross motions for summary

judgment.  The magistrate judge to whom this case was referred recommended that the Court hold

that the primary jurisdiction and filed rate doctrines do not bar the plaintiffs' claims and that the

contract violates the First Amendment rights of inmates.  The magistrate judge recommended that

the Court enjoin the telephone company from paying, and the prison system from collecting, a

portion of the revenue generated by inmate telephone calls but did not recommend that the Court

order the telephone company to reduce its rates.  The parties have filed timely objections to the

magistrate judge's proposed findings and recommended disposition, and the Court has conducted

a *de novo* review of the record.  The Court agrees with the magistrate judge that the claims of the

plaintiffs are not barred by the primary jurisdiction and filed rate doctrines, and the Court adopts that

portion of the proposed findings and recommended disposition as the ruling of the Court on those

issues.  The Court does not agree that the contract between the telephone company and the prison

system violates the First Amendment rights of inmates and therefore declines to adopt the recommendation of the magistrate judge on that issue.

## I.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[1]  A genuine issue of material fact exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party.[2]

## II.

In 2006 the State of Arkansas solicited bids from telephone service providers for the exclusive rights to establish and maintain an inmate telephone system at Arkansas Department of Correction and Department of Community Correction facilities.  Global Tel*Link responded to the request for proposal and offered to pay the Arkansas Department of Correction and the Department of Community Correction a percentage of all gross revenues collected by it for calls under the proposed contract.  In turn, the State would make Global Tel*Link the exclusive provider of telephone services to inmates of the Arkansas Department of Correction and the Department of Community Correction.  During negotiations, Global Tel*Link offered to pay a fifty-five percent commission contingent on the following rates:

|            | Interstate | IntraLATA | InterLATA | Local  |
|------------|------------|-----------|-----------|--------|
| Surcharge  | $3.95      | $3.00     | $3.00     | $3.00  |
| Per Minute | $0.89      | $0.24     | $0.24     | $0.24  |

---

[1]Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005).

[2]*Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

The Board of Corrections[3] requested further negotiations for a lower rate for those who call inmates.

Global Tel*Link made two subsequent offers: Option A included a 50.75 percent commission and

the following rates:

|            | Interstate | IntraLATA | InterLATA | Local  |
|------------|------------|-----------|-----------|--------|
| Surcharge  | $3.95      | $3.00     | $3.00     | $3.00  |
| Per Minute | $0.67      | $0.18     | $0.18     | $0.18  |

Option B included a forty-five percent commission and the following rates:

|            | Interstate | IntraLATA | InterLATA | Local  |
|------------|------------|-----------|-----------|--------|
| Surcharge  | $3.95      | $3.00     | $3.00     | $3.00  |
| Per Minute | $0.45      | $0.12     | $0.12     | $0.12  |

The Board of Corrections chose Option B.

On January 19, 2007, the Office of State Procurement, on behalf of the State of Arkansas,

formally accepted Global Tel*Link's bid and entered into a five-year contract with Global Tel*Link.

Under the terms of the contract, Global Tel*Link agreed to provide a collect call telephone system

for use by inmates housed in the Arkansas Department of Correction and the Department of

Community Correction from February 15, 2007, through February 14, 2012.  Pursuant to the

contract, Global Tel*Link pays the required percentage of revenue to the Arkansas Department of

Correction and the Department of Community Correction on a monthly basis.  Inmates of the

Arkansas Department of Correction and the Department of Community Correction are not allowed

to receive telephone calls from family members, friends, or other people outside of the facility, nor

are they allowed to use prepaid telephone cards or cellular phones.  They are permitted, however,

to make collect calls, *i.e.*, calls for which the receiving party agrees to pay.  Virtually every Arkansas

---

[3] The Board of Corrections has general supervisory power and control over the Arkansas Department of Correction and the Department of Community Correction.  Ark. Code Ann. § 12-27-105(b)(1)(A) (West 2010).

Department of Correction and Department of Community Correction inmate-initiated call, whether long distance or local, is subject to and handled under the contract.

As a result of the contract with Global Tel*Link, the Arkansas Department of Correction and the Department of Community Correction have earned more than $ 2 million per year in revenue, which is used to pay for inmate benefits, operational needs, safety and security needs, and "quality of life projects."  "Quality of life" projects include such things as metal detectors, emergency and security equipment, computer equipment and maintenance, lock and door replacements, medical services equipment, radio and communication maintenance, building construction and maintenance, weapons, and "gate checks," which are given to inmates when they are released from prison.[4]  None of the revenue derived from the contract is used for telephone-related expenditures.  Under the terms of the contract, Global Tel*Link covers all costs associated with the telephone system, including hardware, software, billing, and monitoring at no cost to the State, the Arkansas Department of Correction, or the Department of Community Correction.

Winston Holloway and Joseph Breault are inmates in the Arkansas Department of Correction.  They contend that they are unable to make as many calls as they otherwise would because of the substantial burden that the forty-five percent commission imposes on them and their families.  In addition to the per minute rate and surcharge for each call, if a family member prepays into an

---

[4] Between June 2006 and May 2007, the Arkansas Department of Correction earned $2,306,878.30, and the Department of Community Correction earned $345,962.60 in additional revenue from inmate telephone calls.  Between June 2007 and May 2008, the Arkansas Department of Correction earned $2,147,763.74, and the Department of Community Correction earned $294,252.32.  Between June 2008 and May 2009, the Arkansas Department of Correction earned $2,563,335.03, and the Department of Community Correction earned $319,838.20.  Between June 2009 and October 2009, the Arkansas Department of Correction earned $975,913.86, and the Department of Community Correction earned $148,550.17.  Pls.' Supp. St. of Facts in Support of Mot. for S.J. Ex. E.

account used to pay for calls from inmates, Global Tel*Link charges an additional $9.50 for each $50.00 of prepayment.  With this nineteen percent prepayment charge, a ten-minute long distance call costs an inmate's family approximately $9.30.

Holloway calls one of his two sons, who is in the United States Army and is based in Arizona, when he is in the United States.  When his son is overseas, Holloway calls his daughter-in-law and his grandchildren in Arizona.  He makes such calls about once a month.  Holloway's son and family visit Holloway once every few years.  Holloway also calls one of his two sisters, who live in Lufkin, Texas, about once each month.  His sister tries to visit him in person at least once a year.  Holloway's other sister has not visited him in three or four years.  Letters from Holloway's family are very infrequent.  His grandchildren do not write letters to him, and he seldom gets letters from his sister, his son, or his daughter-in-law.

Breault makes two calls to his closest friend outside of prison each week.  His friend also visits him one or two times each month.

Any visits that the plaintiffs have with family members or friends generally last less than four hours.  The plaintiffs also state that letters are no substitute for telephone calls because they are so infrequent, voices and emotions cannot be heard, and, in Holloway's case, they do not keep him in touch with his grandchildren.  Inmates of the Arkansas Department of Correction are not allowed to use email.

In their complaint, amended complaint, and second amended complaint, the plaintiffs claimed that the telephone charges were unlawful on several grounds, and they also contended that medical co-pay requirements imposed upon them by the Arkansas Department of Correction were unconstitutional.  As the case developed, the plaintiffs dismissed all of their claims except their First

Amendment claims relating to the contract for inmate telephone services.[5]  The plaintiffs then filed a motion for summary judgment, and the defendants filed cross motions for summary judgment. Among other things, Global Tel*Link contended that the plaintiffs' claims are barred by the primary jurisdiction doctrine and the filed rate doctrine.

The magistrate judge recommended that the Court grant the plaintiffs' motion for summary judgment in part, by enjoining Global Tel*Link from paying a percentage of the revenue from inmate telephone calls to the Arkansas Department of Correction during the remaining term of the contract and by enjoining the Arkansas Department of Correction from accepting any payments from Global Tel*Link during the remaining term of the contract.  The magistrate judge declined to recommend that the Court order Global Tel*Link to reduce its rates.  The magistrate judge recommended that the Court enter no injunction involving the Department of Community Correction inasmuch as neither plaintiff resides in one of that department's facilities.

### III.

In their brief in support of their motion for summary judgment, the plaintiffs argue that the broader context in which this case arises is instructive.  In describing that broader context, the plaintiffs note that Arkansas is one of many states that have granted a monopoly to a telephone company for providing telephone services to inmates in return for a percentage of the revenue generated by inmate telephone calls.  The plaintiffs cite to and have filed with their statement of undisputed facts two reports and a Federal Communications Commission ("FCC") order criticizing

---

[5] One defendant, Wendy Kelley, was named as a defendant due to her responsibilities relating to the medical co-pay claim.  Because that claim has been dismissed voluntarily, the magistrate judge recommended that Kelley be dismissed as a party.  Without objection, that recommendation is adopted, and Wendy Kelley is dismissed from this action.

the sort of economic arrangement that is at issue here.[6]

The criticisms of prisons receiving a portion of the revenues from inmate telephone calls are threefold. The first criticism is one of basic economics: the free market does not operate in the prison context in the way that it does in most transactions. As the FCC described it:

> Inmate calling is economically different than other payphone services in two respects. First, inmates have none of the alternatives available to non-incarcerated payphone customers. Inmates only have access to payphones, not cell phones, and inmates lack dial-around capacity. Therefore, neither the inmates who initiate the call nor the individuals who bear the cost of inmate calls–most often the inmates' families–have a choice among providers. Second, the competition that does exist–among ICS[7] providers in the bidding process–does not exert downward pressure on rates for consumers. Instead, perversely, because the bidder who charges the highest rates can afford to offer the confinement facilities the largest location commissions, the competitive bidding process may result in higher rates.[8]

The second criticism is an egalitarian one, *i.e.*, that such arrangements between prison systems and telephone companies result in higher charges for prisoner-initiated telephone calls than for comparable calls, and, moreover, result in the cost of paying for the penal system being born

---

[6] *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 17 FCC Rcd. 6347 (F.C.C. 2002); Comm'n on Safety & Abuse in America's Prisons, Confronting Confinement (2006); Catherine Anderson, *Report Regarding Telephone Services in the Correctional Setting*, 2005 A.B.A. Sec. Crim. Just. Rep. 2. For more expanded criticism, *see* Ben Iddings, Comment, *The Big Disconnect: Will Anyone Answer the Call to Lower Excessive Prisoner Telephone Rates?*, 8 N.C.J. L. & Tech. 159 (2006); Madeleine Severin, Note, *Is There a Winning Argument Against Excessive Rates for Collective Calls from Prisoners?*, 25 Cardozo L. Rev. 1469 (2004).

[7] ICS is an acronym for *inmate calling service*.

[8] *In re Implementation*, 17 FCC Rcd. at 3253; s*ee* Iddings, *supra* note 6, at 162 (characterizing the economic arrangement at issue as a "kickback"); Severin, *supra* note 6, at 1469 (same); s*ee also* Justin Carver, *An Efficiency Analysis of Contracts for the Provision of Telephone Services to Prisons*, 54 Fed. Comm. L.J. 391 (2002).

disproportionately by family and friends of prisoners.[9]

The third criticism is that unduly increasing the cost of inmate telephone calls is bad penal policy. The argument is that "society as a whole benefits when prisoners are granted open lines of communication with their loved ones" because continuing communication with family and friends during incarceration results in lower recidivism rates.[10] Thus, on that argument, good penal policy dictates that telephone services for calls between inmates and their families and friends be provided at a rate that is as affordable as possible.

The high cost of inmate-initiated telephone calls and the perceived unfairness of the high cost have resulted in a substantial number of lawsuits contending on various grounds that the manner and cost of providing telephone services to inmates is illegal. It has been argued that the manner and cost of providing telephone services to inmates violate the Sherman Act,[11] the Telecommunications Act

---

[9] Anderson, *supra* note 6, at 3-4; Iddings, *supra* note 6, at 160-61; Severin, *supra* note 6, at 1469-71.

[10] Iddings, *supra* note 6, at 168.

[11] *Arsberry v. Illinois*, 244 F.3d 558 (7th Cir. 2001); *Ray v. Evercom Sys., Inc.*, No. 4:05CV02904, 2009 WL 2997607 (D.S.C. Sept. 15, 2009); *Byrd v. Goord*, 00 Civ. 2135, 2005 WL 2086321 (S.D.N.Y. Aug. 29, 2005); *Wheeler v. Beard*, No. Civ. A. 03-4826, 2005 WL 1217191 (E.D. Pa. May 19, 2005); *McGuire v. Ameritech Servs., Inc.*, 253 F. Supp. 2d 988 (S.D. Ohio 2003); *Miranda v. Michigan*, 168 F. Supp. 2d 685 (E.D. Mich. 2001); *Daleure v. Kentucky*, 119 F. Supp. 2d 683 (W.D. Ky. 2000); *Francis v. Lantz*, No. CV094034844, 2009 WL 2783721 (Conn. Super. Ct. Jul. 31, 2009); *Bowers v. T-Netix*, 837 A.2d 608 (Pa. Commw. Ct. 2003).

of 1996,[12] state antitrust laws,[13] state consumer protection acts,[14] state unfair trade practices acts,[15] state constitutional requirements of separation of powers,[16] the contracts clause,[17] the prohibition on taking property without just compensation,[18] the equal protection clause,[19] the due process clause,[20]

---

[12] *McGuire*, 253 F. Supp. 2d 988; *Miranda*, 168 F. Supp. 2d 685; *Bowers*, 837 A.2d 608.

[13] *Arsberry*, 244 F.3d 558; *McGuire*, 253 F. Supp. 2d 988; *Miranda*, 168 F. Supp. 2d 685; *Fair v. Sprint Payphone Servs., Inc.*, 148 F. Supp. 2d 622 (D.S.C. 2001); *Alexander v. Marion Cnty. Sheriff*, 891 N.E.2d 87 (Ind. Ct. App. 2008); *Guglielmo v. WorldCom, Inc.*, 808 A.2d 65 (N.H. 2002); *Valdez v. State*, 54 P.3d 71 (N.M. 2002).

[14] *Benson v. State*, 887 A.2d 525 (Md. 2005); *Guglielmo*, 808 A.2d 65; *Bowers*, 837 A.2d 608.

[15] *Valdez*, 54 P.3d 71; *Bowers*, 837 A.2d 608.

[16] *Benson*, 887 A.2d 525; *Valdez*, 54 P.3d 71.

[17] *Arsberry*, 244 F.3d 558; *Byrd v. Goord*, 00 Civ. 2135, 2005 WL 2086321 (S.D.N.Y. Aug. 29, 2005); *McGuire*, 253 F. Supp. 2d 988.

[18] *Walton v. N.Y. State Dep't of Corr. Servs.*, 921 N.E.2d 145 (N.Y. 2009).

[19] *Gilmore v. Cnty. of Douglas*, 406 F.3d 935 (8th Cir. 2005); *Arsberry*, 244 F.3d 558; *Harrison v. Fed'l Bureau of Prisons*, 681 F. Supp. 2d 76 (D.D.C. 2010); *Beaulieu v. Ludeman*, 07-CV-1535, 2008 WL 2498241 (D. Minn. June 18, 2008); *Harrison v. Fed'l Bureau of Prisons*, 464 F. Supp. 2d 552 (E.D. Va. 2006); *Byrd*, 2005 WL 2086321; *McGuire*, 253 F. Supp. 2d 988; *Daleure v. Kentucky*, 119 F. Supp. 2d 683 (W.D. Ky. 2000); *Joost v. Cornell Corrs., Inc.*, No. 97-512T, 1998 WL 939531 (D.R.I. Dec. 11, 1998); *Johnson v. California*, No. CV95-1192-RG, 1996 WL 34442602 (C.D. Cal. July 15, 1996); *Clark v. Plummer*, No. C 95-0046, 1995 WL 317015 (N.D. Cal. May 18, 1995); *Martin v. Coughlin*, 895 F. Supp. 39 (N.D.N.Y. 1995); *Francis v. Lantz*, No. CV094034844, 2009 WL 2783721 (Conn. Super. Ct. Jul. 31, 2009); *Walton*, 921 N.E.2d 145; *Bullard v. State*, 307 A.D.2d 676 (N.Y. App. Div. 2003); *Feigley v. Pa. Public Utility Comm'n*, 794 A.2d 428 (Pa. Commw. Ct. 2002).

[20] *Arsberry*, 244 F.3d 558; *Harrison*, 681 F. Supp. 2d 76; *Ambrose v. Central Mgmt. Servs.*, No. 08-CV-533, 2009 WL 535949 (S.D. Ill. Mar. 4, 2009); *Harrison*, 464 F. Supp. 2d 552; *Woods v. Carey*, No. CIVS050049MCEDADP, 2005 WL 3436366 (E.D. Cal. Dec. 14, 2005); *Byrd*, 2005 WL 2086321; *McGuire*, 253 F. Supp. 2d 988; *Leslie v. Sullivan*, No. 00-C-519-C, 2000 WL 34227530 (W.D. Wis. Nov. 13, 2000); *Oladipupo v. Austin*, 104 F. Supp. 2d 643 (W.D. La. 2000); *Joost*, 1998 WL 939531; *Johnson*, 1996 WL 34442602; *Clark*, 1995 WL 317015;  *Bullard*, 307 A.D.2d 676.

and the First Amendment.[21]

No court has yet held, on any of these legal theories, that a contract between a telephone company and a prison system was unlawful.[22]  "Court challenges to excessive prison telephone rates have consistently failed to provide relief, and future legal victories are unlikely given current Supreme Court jurisprudence."[23]  "Plaintiffs have consistently been unsuccessful in challenging prison phone rates in the courts."[24]

The root of all the criticisms of prison systems receiving a percentage of the revenues from inmate telephone calls is that in this context market forces do not operate to drive costs down and quality up.  As the plaintiffs say in their brief, "instead of competition driving the cost of inmate telephone calls down, the competition for prison telephone contracts with 'commissions' naturally

---

[21] *Arsberry*, 244 F.3d 558; *Johnson v. California*, 207 F.3d 650 (9th Cir. 2000); *Semler v. Ludeman*, No. 09-0732, 2010 WL 145275 (D. Minn. Jan. 8, 2010); *Jayne v. Bosenko*, No. 2:08-cv-02767-MSB, 2009 WL 4281995 (E.D. Cal. Nov. 23, 2009); *Beaulieu*, 2008 WL 2498241; *Bowcut v. Idaho State Bd. of Corr.*, No. CV06-208-S-BLW, 2008 WL 2445279 (D. Idaho June 16, 2008); *Thomas v. King*, No. CV F 06 0649, 2008 WL 802475 (E.D. Cal. Mar. 24, 2008); *Dotson v. Calhoun Cnty. Sheriff's Dep't*, No. 1:07-CV-1037, 2008 WL 160622 (W.D. Mich. Jan. 15, 2008); *Boyer v. Taylor*, No. 06-694-GMS, 2007 WL 2049905 (D. Del. Jul. 16, 2007); *Harrison*, 646 F. Supp. 2d 552; *Riley v. Doyle*, No. 06-C-574-C, 2006 WL 2947453 (W.D. Wis. Oct. 16, 2006); *Woods*, 2005 WL 3436366; *Byrd*, 2005 WL 2086321; *McGuire*, 253 F. Supp. 2d 988; *Muldrow v. Glendening*, No. Civ. A.PJM-00-2416, 2001 WL 34647163 (D. Md. Jul. 19, 2001); *Bennett v. Sheahan*, No. 99-C-2270, 1999 WL 967534 (N.D. Ill. Oct. 5, 1999); *Carter v. O'Sullivan*, 924 F. Supp. 903 (C.D. Ill. 1996); *Clark*, 1995 WL 317015; *Wooden v. Norris*, 637 F. Supp. 543 (M.D. Tenn. 1986); *Walton*, 921 N.E.2d 145;  *Bullard*, 307 A.D.2d 676; *Feigley*, 794 A.2d 428.

[22] Two courts have denied motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), holding that the plaintiffs might be able to prevail if they could show that costs are so exorbitant that they were unable to communicate.  *See Byrd*, 2005 WL 2086321, at *8; *McGuire*, 253 F. Supp. 2d at 1002.

[23] Iddings, *supra* note 6, at 195.

[24] Severin, *supra* note 6, at 1471.

drives the cost up."[25]   That rates for inmate telephone calls are higher than rates outside the prison context, which may reduce communication between inmates and their families and friends, is an effect of the fact that competition in the prison context does not operate to drive rates down.  In other contexts, the antitrust laws or other laws regulating the market operate to drive prices down and quality up, but in this context the courts generally have held that recourse through the antitrust laws is blocked by the state-action doctrine articulated in *Parker v. Brown* and its progeny.[26]   Another obstacle to relief in the courts on grounds of economic policy is that, historically, the telephone industry has been regulated primarily by the FCC and the state public utility commissions, so litigants have found that claims for damages are barred by the filed rate doctrine[27] or some similar doctrine.[28]

---

[25] Br. in Supp. of Pls.' Mot. for S.J. at 4.

[26] *Parker v. Brown*, 317 U.S. 341, 350-51, 63 S. Ct. 307, 313-14, 87 L. Ed. 315 (1943); *see also Ray v. Evercom Sys., Inc.*, No. 4:05CV02904, 2009 WL 2997607, at *3 (D.S.C. Sept. 15, 2009); *Byrd*, 2005 WL 2086321, at *4-5; *Wheeler v. Beard*, No. Civ. A. 03-4826, 2005 WL 1217191, at *3-4 (E.D. Pa. May 19, 2005); *McGuire*, 253 F. Supp. 2d at 1007-09; *Miranda v. Michigan*, 168 F. Supp. 2d 685, 691 (E.D. Mich. 2001); *Francis v. Lantz*, No. CV094034844, 2009 WL 2783721, at *3 (Conn. Super. Ct. Jul. 31, 2009).

[27] *Ray*, 2009 WL 2997607, at *2 ("The filed rate doctrine provides that the rate a public utility or common carrier files with the appropriate regulatory agency is the only legal rate and . . . bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable."); *Daleure v. Kentucky*, 119 F. Supp. 2d 683, 690 (W.D. Ky. 2000) (discussing claims for damages under the antitrust laws based on the filed rate doctrine);*Guglielmo v. WorldCom, Inc.*, 808 A.2d 65, 69-70 (N.H. 2002) (same).

[28] *Valdez v. State*, 54 P.3d 71, 75 (N.M. 2002) (deferring to the appropriate regulatory agency based on the primary jurisdiction doctrine "by which courts that have jurisdiction defer to the expertise of an administrative body"); *cf. Arsberry v. Illinois*, 244 F.3d 558, 563-64 (7th Cir. 2001) (explaining that the primary jurisdiction doctrine is really two doctrines, one of which provides that some issues are with the exclusive original jurisdiction of the agency to resolve subject to judicial review, and the other of which is a form of abstention).

Thus, while the root of the problem is that the operation of market forces is distorted (hence the complaints of "monopoly power" and "kickbacks"), the laws designed to ensure the undistorted operation of market forces do not afford a remedy, in part because of the fact that the state is involved in the contracts at issue and in part because courts are ill-suited to determine the reasonableness of rates charged by utilities.

The Constitution, of course, does set limits on what states may do, though in this context the constitutional parameters of what a state may do have not been clearly explained, perhaps because it has seemed to most courts that the state action at issue has remained well within constitutional limits.  Challenges based on the First Amendment generally have been rejected out of hand based on terse statements that prisoners are not entitled to a specific rate for telephone calls and that the plaintiffs failed to allege that the rates were so exorbitant as to deprive inmates of telephone access altogether.[29]

Perhaps with an eye on these many obstacles to relief for a prisoner challenging rates for

---

[29] *Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000) ("There is no authority for the proposition that prisoners are entitled to a specific rate for their telephone calls and the complaint alleges no facts from which one could conclude that the rate charged is so exorbitant as to deprive prisoners of phone access altogether."); *Semler v. Ludeman*, No. 09-0732, 2010 WL 145275 (D. Minn. Jan. 8, 2010), at *15 (dismissing a claim that telephone rates were expensive because involuntarily committed sex offenders "do not have a First Amendment right to a specific rate for their telephone calls," and the plaintiffs "made no allegation that they are precluded from making telephone calls given the rate charged"); *Jayne v. Bosenko*, No. 2:08-cv-02767-MSB, 2009 WL 4281995 (E.D. Cal. Nov. 23, 2009), at *9-10 (same); *Beaulieu v. Ludeman*, 07-CV-1535, 2008 WL 2498241, at *19 (D. Minn. June 18, 2008) (same); *Bowcut v. Idaho State Bd. of Corr.*, No. CV06-208-S-BLW, 2008 WL 2445279, at *4 (D. Idaho June 16, 2008) (same); *Thomas v. King*, No. CV F 06 0649, 2008 WL 802475, at *3 (E.D. Cal. Mar. 24, 2008) (same); *Dotson v. Calhoun Cnty. Sheriff's Dep't*, No. 1:07-CV-1037, 2008 WL 160622, at *3 (W.D. Mich. Jan. 15, 2008); *Boyer v. Taylor*, No. 06-694-GMS, 2007 WL 2049905, at *9 (D. Del. Jul. 16, 2007); *Riley v. Doyle*, No. 06-C-574-C, 2006 WL 2947453, at *4 (W.D. Wis. Oct. 16, 2006) ("[T]elephone rates charged to institutionalized persons do not implicate the First Amendment no matter how exorbitant they may be.").

telephone services in prison, the plaintiffs in this case dismissed without prejudice their claims under the Telecommunications Act, their Sherman antitrust claim, their claim of breach of fiduciary duty, as well as other claims.[30]   In their motion for summary judgment, the plaintiffs contended only that the contract between Global Tel*Link and the State of Arkansas violates the right of free speech guaranteed by the First Amendment insofar as the contract includes a provision for Global Tel*Link to pay to the State a percentage of the revenue received on inmate calls.   The plaintiffs denied that they were challenging the rates charged by Global Tel*Link and therefore argued that neither the filed rate doctrine nor the primary jurisdiction doctrine applied in this case.   In their reply brief, the plaintiffs were fairly emphatic that they were not challenging the reasonableness of Global Tel*Link's rates:

> Instead, plaintiffs are challenging the "commission" or kickback under the Contract, which has the perverse effects explained in plaintiffs' initial brief.  If the "commission" is eliminated, then the bidding process can operate as it should. Instead of driving the telephone charges to inmates and their families higher, it will result in real market competition, and the rates will take care of themselves.  The "commission" is the evil plaintiffs are trying to eradicate.  The resulting rates are simply part of the harm to plaintiffs which demonstrate their need for injunctive relief.[31]

While denying that they were challenging the reasonableness of Global Tel*Link's rates, the plaintiffs requested the magistrate judge to recommend that the Court enjoin not only the Arkansas Department of Correction and the Department of Community Correction[32] from receiving a portion

---

[30] *See* Br. in Support of Pls.' Mot. for S.J. at 4.

[31] Reply Br. in Support of Pls.' Mot. for S.J. at 13.

[32] Neither plaintiff resides in a Department of Community Correction facility, so, as noted, the magistrate judge did not recommend that the Court enter an injunction as to that agency.  The plaintiffs first objected but then withdrew their objection on that point.

13

of the revenue from inmate telephone calls but also enjoin Global Tel*Link from collecting the portion of the charges that, under the contract, would be paid to those agencies. Thus, despite their disclaimer that this is not a rate case, the plaintiffs in effect have asked the Court to enter an order that would reduce the rates charged by Global Tel*Link by forty-five percent.

Logically, the threshold question is whether prisoners have a First Amendment right of access to telephones. The Sixth Circuit and the Ninth Circuit have said, at least in *dicta*, that the First Amendment guarantees to prisoners some degree of telephone access, subject to reasonable limitations arising from legitimate penological and administrative interests of the prison system.[33] On the other hand, according to the Seventh Circuit, not allowing prisoners access to a telephone might be questionable on other grounds, "but to suppose that it would infringe the First Amendment would be doctrinaire in the extreme[.]"[34] The First Circuit also has said, in *dicta*, "[p]risoners have no per se constitutional right to use a telephone."[35] The Eighth Circuit has said, "in some instances prison inmates *may* have a right to use the telephone for communication with relatives and friends,"[36] while holding that the policy in issue did not violate any right that the inmates may have, thus leaving open the question of whether inmates have a First Amendment right to access to telephone use.

---

[33] *Johnson*, 207 F.3d at 656; *Washington v. Reno*, 35 F.3d 1093, 1099-1100 (6th Cir. 1994).

[34] *Arsberry v. Illinois*, 244 F.3d 558, 565 (7th Cir. 2001).

[35] *United States v. Footman*, 215 F.3d 145, 155 (1st Cir. 2000).

[36] *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989) (emphasis added). The Eighth Circuit also has said that the First Amendment does not require that death row inmates be afforded more than one hour per week of telephone access for personal telephone calls. *McDonald v. Armontrout*, 908 F.2d 388, 392 (8th Cir. 1990).

Arsberry v. Illinois and United States v. Footman have been criticized in this case for offering a conclusion without an in-depth analysis, but the same criticism applies to Washington v. Reno and Johnson v. California: neither the courts holding that prisoners have a First Amendment right to access to telephone use, nor those holding that no such right exists, have supported those holdings with in-depth analyses.  In Washington, the Sixth Circuit said that courts have held "that persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends,"[37] concluding, therefore, without any explanation that the right to communicate with those outside includes the right to use the telephone to do so.  In Johnson, the Ninth Circuit said only, "[a]lthough prisoners have a First Amendment right to telephone access, this right is subject to reasonable limitations arising from the legitimate penological and administrative interests of the prison system."[38]

Although not phrased in this manner, it appears that the Sixth and Ninth Circuits hold that the First Amendment imposes an affirmative obligation on prison systems to provide telephone service to incarcerated persons, whereas the First and Seventh Circuits find no such affirmative obligation in the First Amendment.  The unstated reasoning behind the decisions of the First and Seventh Circuits seems to be that, assuming that the free speech clause of the First Amendment requires prisons to permit communication between prisoners and persons outside the prison,[39] it does

---

[37] Washington, 35 F.3d at 1100 (citing Morgan v. LaVallee, 526 F.2d 221, 225 (2d Cir. 1975)).

[38] Johnson, 207 F.3d at 656 (citing Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986)) (holding that pretrial detainees have a right to telephone access).

[39] See Thornburgh v. Abbott, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989); Procunier v. Martinez, 416 U.S. 396, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974).

not follow that the First Amendment requires that the government provide telephones, videoconferencing, email, or any of the other marvelous forms of technology that allow instantaneous communication across geographical distances; the First Amendment is a limit on the exercise of governmental power, not a source of positive obligation on the part of the government. Within some limits,[40] prisoners retain First Amendment rights, and so prisons are, within some limits, prohibited from interfering with the exercise of those rights, but it does not follow that prisons have an obligation to provide telephones for prisoners to use anymore than it follows that the First Amendment obligates prisons to provide internet access or some other such technology.  In support of that reasoning, it might be pointed out that the source of positive obligation on the part of prison systems is not the First Amendment but the Eighth Amendment, which requires only that prisons provide "the minimal civilized measure of life's necessities."[41]  Thus,

> [w]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . .  The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment. . . .[42]

If the First Amendment imposes no affirmative obligation on prisons, and if the Eighth Amendment requires a prison system to provide only food, clothing, shelter, medical care, and

---

[40] *See Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).

[41] *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981).

[42] *Helling v. McKinney*, 509 U.S. 25, 32, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993) (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 199-200, 109 S. Ct. 998, 1005-06, 103 L. Ed. 2d 249 (1989)).

reasonable safety, then it follows that the Constitution does not require prison systems to provide telephone service to prison inmates.  If that is the case, then the Constitution has nothing to say on the issue of whether, if a prison chooses to provide telephone service to prison inmates, it may reap a financial reward in doing so.

Another argument that would reach the same conclusion is that the First Amendment does not address the nature of the problem here.  As the plaintiffs noted in their briefs, the root problem is one of perverse economic effects arising from a payment described by the plaintiffs as a kickback, which is made possible by the fact that the prison system has monopoly power.  Such perverse economic effects are regulated by antitrust laws and other laws that regulate commercial transactions, not the First Amendment.  The plaintiffs cite no case, and the Court is aware of none, holding that the First Amendment can rectify the effects of monopoly power or kickbacks; nor is the Court aware of any case in which the First Amendment was used as a basis for invalidating a contract between a governmental agency and another party.  To the extent that contracts between prison systems and telephone companies impose higher costs on prisoners and their families and friends than on other persons, that kind of issue would be governed by the equal protection clause, not by the First Amendment.

As has already been noted, the cases generally offer little in the way of explanation for the conclusion that the First Amendment provides no bar to contracts such as the one before the Court. The courts have generally dismissed claims such as this one by saying that prisoners have no right to unlimited telephone use and no right to a specific telephone rate.[43]  Whether or not the First Amendment creates a right for prisoners to have access to telephone service, the cases have, so far,

---

[43] *See supra* note 29.

unanimously held that a contract providing for the telephone company to pay a percentage of the revenues from inmate telephone calls to the prison system is not unlawful, at least so long as prisoners are not absolutely denied all access to telephone service. Severin accurately summarized the state of the law by saying, "[c]urrent interpretation of the First Amendment presents seemingly insurmountable hurdles to inmates and their friends, family, and counsel seeking to challenge rates on the basis that exorbitant rates for calls originating in prisons violate inmates' First Amendment rights."[44]

In denying First Amendment challenges in cases such as this, some of the courts have mentioned the framework of analysis articulated by the Supreme Court in *Turner v. Safley*, but none has engaged in an in-depth analysis applying the four factors identified in *Turner*. In *Turner*, the Supreme Court addressed the constitutionality of a regulation that restricted correspondence between inmates other than immediate family members and a regulation that required an inmate to obtain permission of the superintendent in order to marry. After acknowledging that prisoners retain some protections of the Constitution,[45] and that prison administration is a task left to the executive branch rather than the judicial branch,[46] the court held, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[47] The court then stated that four factors were relevant to determining the reasonableness

---

[44] Severin, *supra* note 6, at 1514. It should be noted that neither Holloway nor Breault alleges that his access to counsel has been limited due to the cost of telephone calls, so the Court will not address whether an inmate's right to counsel is unlawfully abridged by the contract at issue.

[45] *Turner*, 482 U.S. at 84, 107 S. Ct. at 2259.

[46] *Id*. at 84-85, 107 S. Ct. at 2259.

[47] *Id*. at 89, 107 S. Ct. at 2261.

of the regulations at issue: (1) whether there is a reasonable relationship between the prison regulation and the governmental interests that justifies it; (2) whether there are alternative means for exercising the right that remain open to prison inmates; (3) the impact that accommodation of the constitutional right would have on guards and other inmates, as well as the allocation of prison resources generally; and (4) the absence of ready alternatives to the regulation at issue.[48]

It is not at all clear that the *Turner* framework applies to the present case.  The issue in *Turner* related to rules promulgated by the prison system prohibiting or restricting certain conduct by inmates, but the present case involves no prison rules that prohibit or restrict prisoner conduct. Instead, this case presents the issue of whether a prison system may contract with a telephone company to receive a portion of the revenue generated by inmate telephone calls, which is not the kind of issue that the *Turner* framework is designed to address.[49]

The uncertainty as to whether the *Turner* framework applies here is evident from the disagreement of the parties as to the application of the first *Turner* factor to the facts of this case. The first *Turner* factor requires a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.[50]  The defendants say that the governmental interest that justifies the contract with Global Tel*Link is the necessity of raising revenue to support the prisons, and the contractual provision providing for the Arkansas Department of Correction to

---

[48] *Id.* at 89-91, 107 S. Ct. at 2262.

[49] *Cf. Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 417 (3d Cir. 2000) (expressing skepticism as to whether the *Turner* standard applied to a cost recovery program, "which by its own title might be more properly understood as a transfer of funds than a way to regulate prison behavior").

[50] *Turner*, 482 U.S. at 89, 107 S. Ct. at 2262.

19

receive a portion of the revenue from inmate telephone calls is obviously rationally related to that governmental interest because it furthers the interest: the contractual provision raises revenue for the prisons.  The plaintiffs, on the other hand, argue that there is no legitimate governmental interest to support the challenged provision in the contract because the percentage of the revenue paid to the Arkansas Department of Correction is not related to the costs of the telephone system.  (It is undisputed that Global Tel*Link bears all of the costs associated with the telephone system, and the Arkansas Department of Correction pays none of them.)  Thus, as to the first *Turner* factor, the issue is whether a charge that the prison imposes indirectly upon prisoners for goods or services can be justified by the prison's general need to raise revenue, or whether the charge must be tailored to the prison's need to recoup the expenses associated with providing the goods or services.  *Turner* does not answer that question, nor does any case applying *Turner*.

The second *Turner* factor is whether there are alternate means for exercising the right,[51] and that factor can be applied here.  Holloway and Breault can communicate with friends and family through mail and by personal visits.  It may be true that letters do not provide the same satisfaction as telephone calls, and that friends and family cannot visit as often as they can speak on the telephone, but *Turner* says only that where other means for exercising the right are available, courts should be conscious of the need to defer to prison officials.[52]

The third *Turner* factor is the impact that accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally.  "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or prison

---

[51] *Id*. at 90, 107 S. Ct. at 2262.

[52] *Id*.

staff, courts should be particularly deferential to the informed discretion of corrections officials."[53] It seems certain that the loss of more than $2 million per year in revenue would adversely affect the operation of the Arkansas Department of Correction, but it is not at all clear that this is the type of "ripple effect" that is the subject of the third *Turner* factor.

The fourth *Turner* factor is the absence of ready alternatives.[54] The plaintiffs argue that there is a ready alternative, *i.e.*, for the Arkansas General Assembly to appropriate more money for the operation of prisons, but that does not seem to be the sort of "ready alternative" contemplated by *Turner*. *Turner* spoke of an alternative *regulation* that could accommodate the prison's legitimate penological interests while also accommodating a prisoner's rights, not a funding mechanism. If prison funding was the kind of issue contemplated by *Turner*, it would make no sense to include "ready alternatives" as one of the relevant factors because the obvious natural alternative always would be to request additional appropriations from the legislature.

Thus, only one of the four *Turner* factors clearly can be applied in this context; two seem not to apply at all. In short, even if a First Amendment issue is presented in this case, it is not apparent that the *Turner* framework governs the disposition of this case.

The only real argument that the Court has seen for the conclusion that the First Amendment prohibits a prison system from entering into a contract with a telephone company and receive a portion of the revenue from inmate telephone calls is an argument based on the application of the *Turner* factors. If the *Turner* framework does not apply in this context, then there is really not an

---

[53] *Id.*

[54] *Id.* at 90-91, 107 S. Ct. at 2262.

argument left that would justify holding the contract unconstitutional.[55]

In the end, this Court agrees with the opinion of the New York Court of Appeals in *Walton v. New York State Department of Correctional Services*.  In *Walton*, the court acknowledged the *Turner* standard that a prison regulation "is valid if it is reasonably related to legitimate penological standards,"[56] and then held:

> While inmates unquestionably have a constitutional right to communicate with the outside world in a manner and to an extent consistent with their incarcerative status, petitioners point to no persuasive authority for the proposition that this equates to a right to use a specific means for such communication—the telephone—much less to guaranteed telephone services at a particular cost.  Virtually every court to have addressed this issue has held that there is no constitutionally guaranteed right of inmates to use a telephone. . . .
>
> Given that alternate means of communication remain available to . . . inmates and their families (including mail and visitation), with mail offered at low . . . cost . . ., the additional expense associated with the . . . commission on telephone calls did not imperil the right of inmates to communicate with others.  Indeed, petitioners in this case [family members of inmates] indicate that they continued to accept collect calls from their loved ones despite the rate charged by [the telephone company], albeit less frequently.  Although we do not doubt that petitioners would have engaged in more of the real-time, verbal communication afforded by telephone technology if prices had been lower . . . the hardship they allege is not a constitutionally significant curtailment of the right of the free speech and association guarantee, particularly given the limited nature of that right in prison settings.[57]

Here, as in *Walton*, alternate means of communication remain available to the inmates and their

---

[55] The plaintiffs argue that the Court should apply a heightened level of scrutiny, based upon *Pargo v. Elliott*, 69 F.3d 280 (8th Cir. 1995), and *Pitts v. Thornburgh*, 866 F.2d 1450, 1453-54 (D.C. Cir. 1989).  Both of those cases involved equal protection claims, and neither of them has been extended to First Amendment claims asserted by prisoners. *Cf. Johnson v. California*, 543 U.S. 499, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005).

[56] *Walton v. N.Y. State Dep't of Corr. Servs.*, 921 N.E.2d 145, 155 (N.Y. 2009) (quoting *Turner*, 482 U.S. at 89, 107 S. Ct. at 2261).

[57] *Id.* at 155-56 (citations omitted).

families, including mail and visitation.  Moreover, both plaintiffs continue to place telephone calls to friends and family on a fairly regular basis.  Holloway makes approximately two telephone calls per month to members of his family, and Breault makes approximately two calls per week to a close friend.  Although the Court does not doubt that Holloway and Breault would engage in more of the real-time, verbal communication afforded by telephone technology if prices were lower, the hardship they allege "is not a constitutionally significant curtailment of the free speech and association guarantee, particularly given the limited nature of that right in prison settings."[58]

## CONCLUSION

For the reasons stated, summary judgment is entered in favor of the defendants on the claims of Winston Holloway and Joseph Breault.  The complaint of Winston Holloway and Joseph Breault is dismissed with prejudice.

IT IS SO ORDERED this 21st day of January, 2011.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[58] *Id.*